**GRIFFY'S LANDSCAPE MAINTENANCE LLC,**
Plaintiff,

v.

**THE UNITED STATES, Defendant.**

No. 01–309C.

United States Court of Federal Claims.

Aug. 17, 2001.

Sam Zalman Gdanski, Suffern, NY, for plaintiff.

Daniel D. McClain, Department of Justice, with whom were Acting Assistant Attorney General Stuart E. Schiffer, Director David M. Cohen, and Deputy Director James M. Kinsella, Washington, DC, for defendant. Captain Ryan M. Zipf, Office of The Judge Advocate General, United States Army, Arlington, VA, of counsel.

## OPINION

BASKIR, Chief Judge.

Plaintiff, Griffy's Landscape Maintenance, LLC, ("Griffy") has invoked the bid protest jurisdiction of this Court, pursuant to 28 U.S.C. § 1491(b)(1), to mount a variety of legal challenges to the United States Department of the Army's ("Army") procurement of tree trimming and right of way maintenance services at Fort Campbell, Kentucky.

This contract has been extremely contentious. From the time of its inception it has been the subject of nine bid protests. On a previous occasion we reviewed the procurement when Griffy brought a post-award bid protest challenging the award to Easy Tree Services of a best-value solicitation for these services. We sustained Griffy's protest, concluding that the Army failed to meet a duty of inquiry with respect to Griffy's missing insurance information. *See Griffy's Landscape Maintenance LLC v. United States,* 46 Fed.Cl. 257 (2000).

Since then, the Army's pursuit of this contract has undergone further administrative challenges both at the agency level and at the Government Accounting Office (GAO). Chance has brought this second bid protest by Griffy to us for resolution. In the wake of the last of these disputes, a GAO bid protest by Easy Tree, the Army decided to terminate the award to Griffy for convenience of the government, to cancel the best-value solicitation, and to re-solicit the contract as a sealed bid. Plaintiff's initial complaint challenged the termination of its contract and sought a variety of injunctive and monetary relief, including lost profits.

In response to plaintiff's motion for a permanent injunction, defendant moved to dismiss the case for lack of subject matter jurisdiction and moved for judgment on the administrative record, pursuant to RCFC 12(b)(1) and RCFC 56.1, respectively. Defendant's motion to dismiss is GRANTED in part and DENIED in part. Defendant's alternative request for summary judgment as to that portion of the merits that survive the motion to dismiss is GRANTED. Accordingly, Plaintiff's motion in support of a permanent injunction is DENIED.

## BACKGROUND

Although we resolve this case on jurisdictional and legal grounds largely independent of the tortured history of this deceptively prosaic procurement, we set forth that history below as a case study of Murphy's Law of Government Procurement. The first stages of the contracting history of the parties are recounted in detail in our previous opinion. *See Griffy's Landscape Maintenance LLC v.*

*United States*, 46 Fed.Cl. 257 (2000)(*Griffy's I*). Although that case turned on a flaw in the evaluation of bids, giving us little reason to devote much attention to substantive aspects of the solicitation, we did learn a few things about the procurement.

The solicitation issued in May 1999 announced a "best value" procurement for the maintenance services. Although labeled a "negotiated" procurement, bidders were advised that there would be no negotiations or discussions. In character it was similar to a sealed bid procurement where there are no post-submission contacts with bidders. By the July 1999 closing date, the Army had received six proposals and evaluated each based on the offerors' past performance and price, weighted 60/40, past performance to price. The Army determined that Easy Tree offered the best value and it was awarded a contract on September 20, 1999.

In *Griffy's I* plaintiff asserted that the Army improperly failed to award it any points for one of the three past-performance sub-factors because insurance information was missing from its submission. As it turned out, a simple phone call would have ultimately uncovered an insurance rating that would make Griffy competitive with Easy Tree. Accordingly, we faulted the government for failing in its duty to inquire in the face of an apparent clerical error:

> We would find it bizarre to conclude that the Army has an obligation to clarify a bidder's clerical error, but not its own. Such a policy endorses official negligence. We see no reason to do so when the missing information is as prosaic and self-authenticating as a name and phone number. The integrity of the procurement process is enhanced, not harmed.
>
> The government's obligation is clear and simple. If it suspects a clerical error, it must ask. We therefore find that the Army's failure to inquire under these circumstances is arbitrary and capricious and a violation of 5 U.S.C. § 706.

*Griffy's I*, 46 Fed.Cl. at 261.

Additionally, we observed that because this was a best-value procurement and given Griffy's substantially lower price—approximately 20 percent—any points more than zero in-creased the chances of Griffy winning the contract. But in the end, the paramount interest in upholding the integrity of the procurement system persuaded us to grant Griffy's injunction. We vacated the award to Easy Tree and directed the Army to re-evaluate Griffy's proposal and make a new award consistent with our opinion. *Id.*

That is the last we heard from these parties for a year, but the disputes continued. The Army did re-evaluate the proposals and, after remedying its previous oversights, awarded the contract to Griffy on May 23, 2000. There were other loose ends. Prior to filing its initial complaint in *Griffy's I* on December 14, 1999, plaintiff had pursued a GAO protest in which it also challenged its low score for a performance factor described as "similarity and complexity of work." We did not have to rule on this issue, because the GAO had previously found in favor of Griffy and had revised its score accordingly. However, the performance factor touched off further litigation at the boards even after our ruling in *Griffy's I*, as Easy Tree continued to press this issue as well as others.

The Army repeatedly defended its conclusions regarding the similarity of work issue, and its decision to make the subsequent award to Griffy. The decision was upheld in Easy Tree's agency-level protest. Easy Tree then took its objection to the GAO, and the Army was initially prepared to defend its position.

Upon further consultation with legal counsel, and after further analysis of the similarity of work factor, the contracting officer determined that there were indeed errors in the evaluation process that cast doubt on the award decision. The errors included both evaluator oversight and a flawed formula. It is not necessary to delve too deeply into the substance of the errors; the contracting officer concluded that they "were substantial enough to affect the outcome of the award." Affidavit of Roy Murray. The contracting officer also indicated that, based upon his discussions with the counsel, a representative of the Army's Judge Advocate General, he determined there was a substantial risk that the Army would lose the GAO bid protest

brought by Easy Tree. *Id.* The Army made its re-evaluation known and agreed to take corrective action; on that assurance the GAO dismissed the protest as moot on August 17, 2000.

On August 30, 2000, the Army informed Griffy that it was terminating its contract for the convenience of the government. Initially, the Army intended to re-evaluate the offerors' past performance alone. However, this approach raised issues as to the proper scope of past performance to be considered and the extent to which negotiations would have to be re-opened. In fact, Easy Tree filed two more protests with the contracting officer in connection with these issues.

Several months after the termination for convenience, the Army finally determined to cancel the original May 1, 1999 solicitation and re-solicit bids. This time, however, the Army chose to award the contract through the simplified Request for Quotations (RFQ) procedure. Under the new procedure the offerors submitted sealed bids and the agency considered cost of proposals only, to the exclusion of the various performance factors considered previously.

The rationale for abandoning the RFP and employing this new process is documented in the February 16, 2001 notice of cancellation. The contracting officer gave three reasons for the decision. First, the pricing on the current proposals had expired. In fact, at that point the one-year contract that had been awarded to Griffy would have been entering into its option years, where presumably the price would have been adjusted. Second, the Fort Campbell activity was unwilling to pay a premium for the services required, and the agency desired the lowest-price responsible offeror. This concern was also reflected in a memorandum signed by Colonel Thomas L. Bailey, Director of Public Works at the post. Colonel Bailey noted that "[t]ree trimming and leaf collection is simply not such a complex service that we are willing to pay a premium price to obtain under a best value contract." He indicated that the previous best value procurement was not in the best interests of the Army, and recommended that a simplified sealed bid, fixed price procedure be employed. The

third reason given for re-soliciting the contract was that it was not feasible to re-evaluate solicitations based on past performance data submitted in July 1999, nearly 20 months prior.

On May 2, 2001, the Army issued the new solicitation. Sealed bids were due by May 23, 2001. Griffy filed its Complaint here on May 22, 2001, protesting the new procedure as well as the decision to re-solicit at all. Among it's objections, Griffy notes that its initial bid had already been made public in standard procurement debriefings and in the previous litigation. In the wake of this second court challenge, and presumably reconciled to the changing tide of this procurement, the Army agreed to suspend an award of the contract until the earlier of August 17, 2001, or this Court's decision. On July 26, 2001, we held oral argument on the parties' motions. Subsequently, the government informed us that it would agree to suspend the award even beyond August 17, 2001, if necessary. Given our ruling today, the Army need delay no more.

### DISCUSSION

In his approach to this litigation, counsel for the plaintiff has utilized that all-too-familiar legal strategy of asking for everything under any kind of theory in hopes that he might be lucky enough to stumble on a winner. Thus in his Complaint, for example, he cites our bid protest jurisdiction, and asks for lost profits. As the litigation has progressed, counsel has shifted ground, discarding theories and offering new ones.

Plaintiff's Complaint and subsequently filed briefs can be interpreted to present three claims. First, plaintiff alleges that the government is in violation of the Court's Order in *Griffy's I.* Second, Griffy objects to the Army's decision to terminate the initial contract for convenience. Finally, Griffy challenges the new solicitation on a number of bases—because the termination of the previous contract was improper, and because the subsequent RFQ process amounted to an "illegal auction." The first two theories can not serve as grounds for relief, at least not under our equitable bid protest jurisdiction.

The third is rejected on the merits. We address each theory in turn.

### Enforcement of Griffy's I

This Court certainly has the power to enforce performance where the agency has not followed the court's order. However, an attack upon a new solicitation or upon any other aspect of the administration of the previous contract, must stand on its own. Jurisdiction for the claim must be independently grounded upon either our bid protest jurisdiction, 28 U.S.C. § 1491(b)(1), or in the alternative, our jurisdiction over express contracts or implied contracts, 28 U.S.C. § 1346(a)(2), as governed by the Contract Disputes Act of 1978, 41 U.S.C. §§ 601 *et seq.* ("CDA"). Plaintiff has invoked only the former.

A mere allegation that our ruling in *Griffy's I* was ignored does not give rise to a new bid protest action. Plaintiff's brief proclaims that the Army's actions after making an award in accordance with our Order "make a mockery of the Court's ruling in *Griffy I.*" However, plaintiff does not expand upon the accusation by offering specific aspects in which the Army violated the Order.

We found that the Army neglected to make a basic inquiry when confronted with missing information in Griffy's proposal. *Griffy's I*, 46 Fed.Cl. at 261. We held that the failure to inquire was arbitrary and capricious, and that the oversight most certainly affected the award decision. *Id.* Accordingly, we vacated the award and directed the Army to re-evaluate the bids consistent with our decision. *Id.* There has been no demonstration that the Army failed in this regard, and the fact that the Army subsequently awarded the contract to Griffy is irrefutable evidence to the contrary.

Griffy launches attacks upon the Army's treatment of subsequent disputes generated by Easy Tree, most of which were resolved in Griffy's favor. In the end, Griffy accuses the Army of capitulating to protests that were without merit. However, we are never shown why these disputes are relevant to the issues previously litigated or how the Army's actions are in violation of *Griffy's I*. Plaintiff has, therefore, offered no more than conclu-sory allegations to support its claim that the Army violated this Court's Order and thus has failed to meet its burden to establish jurisdiction on this basis. *See CC Distrib., Inc. v. United States*, 38 Fed.Cl. 771, 775 (1997) ("[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss."), quoting *Briscoe v. La-Hue*, 663 F.2d 713, 723 (7th Cir.1981).

### Termination for Convenience

Griffy's second theory attacks the Army's decision to terminate the contract it was awarded, invoking our bid protest jurisdiction, not our CDA jurisdiction. Among other things, plaintiff seeks injunctive relief to restore its contract—relief not included in our injunctive powers under the bid protest jurisdiction, and not available from us even under the CDA.

The government argues that the CDA is the proper vehicle for a contractor to challenge a termination decision. The government's motion to dismiss is based upon the argument that Griffy was not an "interested party" under the 1996 amendments to the Tucker Act conferring bid protest jurisdiction upon the Court. The statute provides, in pertinent part:

> ... the United States Court of Federal Claims shall have jurisdiction to render judgment on an action by an *interested party objecting to a solicitation* by a Federal Agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement.

28 U.S.C. § 1491(b)(1) (emphasis added).

The "interested party" requirement is met where the protesting party is an "actual or prospective bidder" with a "direct economic interest [that] would be affected by the award or failure to award the contract." *American Federation of Government Employees, AFL–CIO v. United States*, 258 F.3d 1294, 1302 (Fed.Cir.2001); *Federal Data Corp. v. United States*, 911 F.2d 699, 703 (Fed.Cir.1990)(protestor must be actual or

prospective bidder who would have been in a position to receive the challenged award).

Defendant points to a series of decisions which limit bid protest actions to disappointed bidders as opposed to contracting parties. *See Anderson Columbia Envtl., Inc. v. United States,* 42 Fed.Cl. 880, 883 (1999)(Tucker Act amendments do not confer upon contract awardee unconditional right to intervene in protest brought by unsuccessful bidder); *see also Delbert Wheeler Constr., Inc. v. United States,* 39 Fed.Cl. 239 (1997)(offeror within zone of consideration for contract is an "interested party"), *aff'd* 155 F.3d 566, 1998 WL 244202 (Fed.Cir.1998)(table); *Ingersoll–Rand Co. v. United States,* 780 F.2d 74, 79 (D.C.Cir.1985). Under these authorities, defendant argues, plaintiff is not an interested party because it was awarded the contract. Rather, plaintiff is a party to the contract with rights that are defined by the contract and enforced by the Contract Disputes Act, 41 U.S.C. § 601.

The government reads 28 U.S.C. § 1491(b)(1) more absolutely than we would. There may be circumstances where a *successful* bidder would have a direct economic interest that is affected by the award of the contract. However, at least with regard to the initial contract's termination we agree—plaintiff is not challenging the award, but the termination. Plaintiff is aware of the distinction. Counsel represented to the Court at oral argument that it is in the final stages of preparing a claim under the CDA for the contracting officer, a pre-condition to litigation before the Court. Still, plaintiff asserts that the mere fact that an additional independent remedy under the CDA exists for monetary damages does not divest this Court of bid protest injunctive jurisdiction. While it is not uncommon for there to be more than one theory of recovery for a wrong, Griffy has not supported its assertion with authority or logic. Griffy's termination claim is a CDA claim dressed in bid protest clothes.

The last of the government's cases, *Ingersoll–Rand,* is similar to our case in that the plaintiff's "complaint breaks down into two essential components: wrongful termination of the contract and unlawful re-solicitation of the contract." *Ingersoll–Rand,* 780 F.2d at 77. In fact, as in Griffy's case, the objection to the re-solicitation was based on the fact that plaintiff's bid was already known to prospective competitors. *Id.* The Court concluded that the termination aspect was controlling, an analysis with which we disagree. We are, of course, not strictly bound by this decision of a sister circuit.

In striking contrast to the similarities in *Ingersoll–Rand,* however, is the fact that a question of forum was at issue there. The Circuit Court grappled with the question of whether it was presented with a CDA action, for which jurisdiction did not lie, or a bid protest, for which it did. The Court obviously recognized that, to the extent it involved the violation of procurement regulations, the case posed issues within its powers to resolve. However, it also believed that as a whole the case was more suited to the unique expertise of the Court of Federal Claims. *Id.* at 78. As we interpret the decision, therefore, the Circuit Court decided to treat this double-barreled claim as one that could not be separated into CDA aspects and bid protest aspects. As the Court put it, "it is possible to conceive of this dispute as entirely contained within the terms of the contract ... [which] included a termination-for-convenience clause." *Id.* We are, however, guided by a different approach.

A similar situation existed in *Roxco, Ltd. v. United States,* a case brought to our attention by the plaintiff. No. 98–5069, 1999 WL 160608 (Fed.Cir. March 19, 1999)(unpub.) The citation of this unpublished Federal Circuit decision gives us pause. The Rules of the Circuit state that: "An opinion or order which is designated as not to be cited as precedent is one unanimously determined by the panel issuing it as not adding significantly to the body of law." Fed. Cir. R. 47.6(b). However, plaintiff is not before the Court of Appeals, but before our Court, and it is unclear whether this rule is meant to apply to proceedings before us—or even that it could. *See* Fed. R.App. P. 1(a)("these rules govern procedure in the United States courts of appeals.") Our Court has a similar rule, but it is even more problematic. It states:

Unpublished opinions and orders *of the court* are binding on the parties, but have

no precedential effect. Opinions and orders designated as unpublished shall not be employed as authority by this court and may not be cited by counsel as authority, except in support of a claim of *res judicata*, collateral estoppel, or law of the case. RCFC 52.1(a)(emphasis added). Note that this rule applies to Court of Federal Claims unpublished opinions, not unpublished opinions of other courts. Moreover, even published opinions of this Court are not binding on the Court. (The Court has proposed to strike Rule 52.1 in its forthcoming draft revision of the Rules.)

Both the propriety and the need for such rules have recently come into question. Judge Arnold has written an eloquent opinion arguing that the notion of unpublished, non-precedential opinions is unconstitutional because, among other things, obedience to precedent is the only brake on arbitrary judicial decision-making. *Anastasoff v. United States*, 223 F.3d 898 (8th Cir.2000), *vacated on rehearing en banc*, 235 F.3d 1054. And the American Bar Association has just days before this writing rejected by an overwhelming vote the practice of prohibiting citation to unpublished opinions. A.B.A. HOUSE OF DELEGATES RES. NO. 115 (August 7, 2001). It concluded that there is no longer a practical need to conserve publishing space now that there is unlimited room to publish on the Internet. Indeed, the text of *Roxco*, omitted in the Federal Reporter, has been electronically published in Westlaw. *See Roxco v. United States*, 185 F.3d 886 (table), 1999 WL 160608 (Fed.Cir.1999).

■ None of this is helpful, however, in guiding this Court to an understanding of how it should treat unpublished opinions of other courts. We believe that as a court we are free to find guidance where we may. In contract cases we look to the opinions of the Comptroller General—which, after all, are legally only advisory—to boards of contract appeals, and to opinions of our colleagues on this Court. We reject those which we find illogical, unpersuasive, or just plain wrong-headed. We accept as helpful authority, albeit not binding precedent, those we find sound. We think we may do the same with the unpublished opinions of the circuit courts

of appeal, just as we do with the opinions those courts publish. The same principle applies to our regard for the unpublished opinions of our own Federal Circuit.

■ Discretion dictates that we do not relegate a Federal Circuit unpublished opinion to the first category, tempted as we might be by the opportunity to treat their work uncharitably. Fortunately, we find *Roxco* logical, sound and persuasive. Unfortunately for the plaintiff, it supports the government's position. Whether treated as helpful precedent or as a happy coincidence, our analysis is the same.

Plaintiff Roxco was initially successful in its bid. Subsequent to the award the Navy decided to re-evaluate the selection process and then re-solicit bids under new criteria. In contrast to the D.C. Circuit, our Court of Appeals concluded there were two independent issues. The impending termination presented a CDA claim. The challenge to the re-solicitation was a bid protest. The Court held that a bid protest action must be resolved without regard to the previous award. *Roxco*, 1999 WL 160608 at * 1. It made clear that the existence of a CDA claim did not affect the Court's injunctive powers over other aspects of the case that fall within this Court's valid bid protest jurisdiction. *Id.* at * 3. However, the Circuit Court noted that the first contract had not yet been formally terminated—the propriety of the contract's termination was clearly not ripe as an issue. In contrast to *Roxco*, plaintiff Griffy's contract has been formally terminated. But what is important for us is *Roxco's* implication that termination would not be an issue anyway, ripe or not, *as a bid protest*. The termination for convenience may be litigated here, as any other improper termination claim, provided the jurisdictional prerequisites of the Contract Disputes Act are met. That case has not yet been brought.

### Re-solicitation

Plaintiff also objects to the Army's decision to hold a new solicitation. Taken to its logical extension, Griffy's argument necessarily goes full circle to attack the Army's decision to terminate the contract. As we have held,

in its present posture we can not rule on this aspect of Griffy's Complaint. But plaintiff also contends that the mode of the subsequent procurement placed Griffy at a competitive disadvantage because Griffy's price bid was public knowledge at that point. Plaintiff cited no specific authority for this theory. However, it did characterize the violation as an "auction" in violation of procurement regulations and it challenged the decision to change the procurement to an RFQ. The plaintiff gives little attention to these arguments in its briefing, and we would be justified in holding them abandoned. But they are the only claims to survive the government's motion to dismiss, and so we will address them on the merits, scant though they are.

As a bidder on the RFQ, Griffy has a "direct economic interest [that] would be affected by the award or failure to award the contract," and so is an "interested party." *AFL–CIO*, 258 F.3d at 1302. Furthermore, in objecting to an "auction" Griffy has alleged a "violation of a statute or regulation in connection with a procurement or proposed procurement." *See Phoenix Air Group, Inc. v. United States*, 46 Fed.Cl. 90 (2000)(subcontractor claimed that agency violated Armed Services Procurement Act (citation omitted) in modifying a contract rather than conducting new competition for services). The makings of a bid protest claim are here. So with a viable target finally placed within the crosshairs of our bid protest jurisdiction, we take aim now at the Army's decision to re-solicit the contract under the new terms.

This Court will grant a motion for summary judgment where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). The government, having moved for judgment on the administrative record, must establish the absence of any dispute of material fact, a fact of consequence to the outcome of the case. *Cincom Systems, Inc. v. United States*, 37 Fed.Cl. 663, 670 (1997). There are no factual disputes in this case. Inferences drawn from the evidence, in this case the administrative record, are viewed in the light most favorable to the opposing party. *Id.* at 671.

■ However, in the context of a bid protest the scope of our review, as defined by the Administrative Procedures Act, is narrow. 5 U.S.C. §§ 701–706 (1994); *see* 28 U.S.C. § 1491(b)(4); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). We review the agency's procurement decisions under a deferential standard, only setting aside an action or decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The determination turns on whether: (1) there was subjective bad faith on the part of procurement officials; (2) there was not a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; or (4) pertinent statutes or regulations were violated. *Metric Sys. Corp. v. United States*, 42 Fed.Cl. 306, 310 (1998); *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974). But the Court may not substitute its judgment for that of the agency. *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814.

The agency action we review here is limited to the Army's decision to re-solicit the procurement under the modified terms—that is, the decision to employ the RFQ procedure and the determination that price alone will be considered in awarding the contract. In this respect, Griffy's principal complaint is that the procedure left it in the unenviable position of bidding against itself since its previous bid was public knowledge. *Cf.* JOHN CIBINIC, JR. AND RALPH C. NASH, JR., FORMATION OF GOVERNMENT CONTRACTS 636 (3d ed. 1998)("Cancellation of a procurement after bid opening is a serious matter because it can give bidders an unfair advantage if they are later permitted to re-compete with knowledge of the prior bids.") Although the disclosure of one's price bid is never a good thing, it is especially damaging where the procurement has evolved into a price-only competition. Plaintiff asserts that the solicitation process was thus transformed into an auction.

At one time, the Federal Acquisition Regulation ("FAR") included provisions specifically prohibiting "auction techniques" during

negotiations. Prohibited techniques included:

(i) Indicating to an offeror a cost or price that it must meet in order to obtain further consideration;

(ii) Advising an offeror of its price standing relative to another offeror (however, it is permissible to inform an offeror that its cost or price is considered by the Government to be too high or unrealistic); and

(iii) Otherwise furnishing information about other offerors' prices.

48 C.F.R. § 15.610(1997). Part 15 of the FAR was subsequently revised to delete the reference to "auctions techniques". All that remains is a provision that prevents procuring officials from "engag[ing] in conduct ... that reveals an offerors [sic] price without that offerors [sic] permission." 48 C.F.R. § 15.306(e)(1998); *see DGS Contract Service, Inc. v. United States,* 43 Fed.Cl. 227, 239 (1999); JOHN CIBINIC, JR. AND RALPH C. NASH, JR., FORMATION OF GOVERNMENT CONTRACTS 892 (3d ed.1998).

The FAR also provides:

Preservation of the integrity of the competitive bid system dictates that, after bids have been opened, award must be made to that responsible bidder who submitted the lowest responsive bid, unless there is a compelling reason to reject all bids and cancel the invitation.

FAR 14.404–1(a)(1). As with the "auction" provision and its successor, this section is intended to prevent the procuring agency from artificially driving prices down during negotiations or getting a second bite at the apple, as it were.

■ Strictly speaking, none of these FAR provisions applies here, of course, since the Army did not cancel an Invitation For Bids or request new Best And Final Offers in the midst of negotiations and prior to award. Furthermore, the price bids for the original solicitations, both Griffy's and Easy Tree's, were disclosed by operation of law. This was a consequence of Griffy's own lawsuit, not an attempt by the Army to drive the prices down. Finally, any prejudice Griffy might suffer from having its bids disclosed is vitiated by the fact that those bids are two years old at this point. Griffy has suffered no harm by the disclosure. In the context of pre-award negotiations the contracting officer is given latitude in deciding whether to cancel a solicitation and request new bids after price offers have been disclosed. *See Overstreet Electric Co., Inc. v. United States,* 47 Fed.Cl. 728, 732–34 (2000)(agency properly canceled solicitation and converted it to negotiated procurement after determining low price bid was unreasonable); *Caddell Constr. Co. v. United States,* 7 Cl.Ct. 236, 241 (1985)(authority vested in contracting officer to decide whether to cancel an invitation for bids and readvertise is extremely broad.)

■ The reasons stated by the contracting officer for canceling the solicitation and offering a new solicitation as an RFQ easily pass muster under our limited scope of review for protests. 5 U.S.C. § 706(2)(A). We limit our inquiry to "whether the decision was based on a consideration of the relevant facts and whether there has been a clear error of judgment." *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814 (citations omitted). We can find no evidence of bad faith. In fact, the Army's actions are the antithesis of bad faith. The attorneys and procurement officials involved here took a hard look at the alleged defects in the solicitation process and decided to take corrective action. In doing so, they acted responsibly and ethically.

The contracting officer's decision to issue an RFQ is supported by the administrative record. The procuring activity, an installation that is home to one of the Army's few remaining infantry divisions—in this case, the legendary "Screaming Eagles" of the 101st Airborne—has to make do with competing missions and limited funds. The correspondence from Colonel Bailey demonstrates that the reason for changing the terms of the solicitation was to streamline what really was never a technical procurement in the first place. Saving money was the driving force. As Colonel Bailey stated: "Funds are limited and we need to get the most money for our money." By seeking to get the cheapest contractor, it may turn out that the Army will get the wrong contractor for the job. But we certainly can not say that there was no rational basis for the agen-

cy's choice. *See Baird Corporation v. United States,* 1 Cl.Ct. 662, 664 (1983).

### CONCLUSION

For the foregoing reasons, we conclude that plaintiff has failed to establish by a preponderance of the evidence bid protest jurisdiction pursuant to 28 U.S.C. 1491(b)(1) with respect to the government's alleged violation of this Court's Order in *Griffy's I* and with respect to termination of plaintiff's contract. Upon review, we reject plaintiff's allegations that the contracting officer conducted an illegal auction or improperly changed the nature of the procurement.

Plaintiff's motion for a Permanent Injunction is DENIED. Defendant's Motion to Dismiss is GRANTED in part and DENIED in part. Defendant's Motion for Judgment on the Administrative Record is GRANTED. The Clerk will dismiss the Complaint. No costs.

**IT IS SO ORDERED.**